**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DONTANEOUS SALLEY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-5700 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| SGT. PARKER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Dontaneous Salley, an inmate with the Illinois Department of Corrections ("IDOC"), arrived at Stateville Northern Reception Center ("Stateville NRC") in mid-2018. He stayed for only 18 days, but it was long enough to inspire five grievances about his confinement. The five grievances covered four issues, including complaints about his medical care, religious dietary restrictions, disability, and living conditions.

Salley later transferred to a new facility and filed this lawsuit. Defendants now move for summary judgment, arguing that Salley failed to exhaust his administrative remedies. *See* Dckt. Nos. 63, 67. Most of the IDOC Defendants joined a single motion for summary judgment. Defendant Kelsey Exner, a mental health professional at Stateville NRC, filed a motion of her own.

For the reasons stated below, the Court grants Defendant Exner's motion for summary judgment. The Court grants in part and denies in part the IDOC Defendants' motion for summary judgment.

**Background**

Salley is an inmate in IDOC custody. *See* Pl.'s Resp. to Exner's Local Rule 56.1 Statement of Facts, at ¶ 4 (Dckt. No. 86); Pl.'s Resp. to IDOC's Statement of Undisputed Material Facts, at ¶ 1 (Dckt. No. 83). He was admitted to Stateville NRC on June 6, 2018, for a temporary stay. *See* Pl.'s Resp. to Exner's Local Rule 56.1 Statement of Facts, at ¶ 4; Pl.'s Resp. to IDOC's Statement of Undisputed Material Facts, at ¶¶ 2–3.

After transferring to a new facility, Salley filed a complaint under 42 U.S.C. § 1983 against six individual defendants who worked at Stateville NRC. *See* Pl.'s Resp. to Exner's Local Rule 56.1 Statement of Facts, at ¶ 1 (Dckt. No. 86); Pl.'s Resp. to IDOC's Statement of Undisputed Material Facts, at ¶ 2 (Dckt. No. 83); *see also* Cplt. ¶¶ 4–15 (Dckt. No. 6). He alleges four basic problems about his confinement: (1) deliberate indifference to a serious medical condition; (2) failure to accommodate his religion; (3) failure to accommodate a disability; and (4) inhumane living conditions. *See* Cplt. ¶¶ 69–72, 74–76. The merits of his claims aren't at issue here – the only question is whether he exhausted his administrative remedies.

First, Salley alleges that Defendant Exner did not give him proper care for his suicidal feelings during his mental health intake evaluation on June 6, 2018. *See* Pl.'s Resp. to Exner's Local Rule 56.1 Statement of Facts, at ¶ 7 (Dckt. No. 86). Salley told Exner that he was feeling suicidal. *See id.* at ¶ 8; Exner's Resp. to Pl.'s Statement of Additional Undisputed Facts, at ¶ 1 (Dckt. No. 90). He told her that he was a "Serious Mental Illness" inmate and needed treatment. *See* Pl.'s Resp. to Exner's Local Rule 56.1 Statement of Facts, at ¶ 8; Exner's Resp. to Pl.'s Statement of Additional Undisputed Facts, at ¶ 1. But Exner allegedly told Salley that he couldn't see the lead mental health doctor at Stateville NRC unless he actually attempted suicide.

2

*See* Pl.'s Resp. to Exner's Local Rule 56.1 Statement of Facts, at ¶ 9.  In the meantime, she said that she would try to get Salley his medication.  *Id.*

Second, Salley complains that Defendants interfered with his ability to observe his faith. *See* Cplt. ¶¶ 33–34, 36, 39–40, 45.  Salley was in the midst of fasting for Ramadan when he arrived at Stateville NRC on June 6.  *See* Pl.'s Resp. to IDOC's Statement of Undisputed Material Facts, at ¶ 3 (Dckt. No. 83).  He claims that he told the IDOC Defendants about his religious observance and dietary restrictions, which prevented him from eating until the sun went down.  *Id.* at ¶ 4.  But the IDOC Defendants allegedly prevented Salley from saving his food trays until dusk, effectively forcing him to starve or forsake his religious practices.  *See id.* at ¶ 5.

Third, Salley alleges that the IDOC Defendants did not accommodate his disability. Salley claims that he walked with a crutch when he arrived at Stateville NRC.  *See* Cplt. ¶ 22. After an initial medical evaluation, he received a low gallery permit because of his limited mobility.  *See* Pl.'s Statement of Additional Undisputed Material Fact, at ¶ 5 (Dckt. No. 84).  But he was placed in a second-floor cell.  *Id.* at ¶ 6.  At some point, Salley fell down a flight of stairs, injuring himself.  *Id.* at ¶ 7.

Finally, Salley complains that his living conditions were inhumane.  The cell was covered in rat feces, and he was deprived of cleaning supplies and personal hygiene products.  *See* Pl.'s Statement of Additional Undisputed Material Facts, at ¶ 8 (Dckt. No. 84).  The light in his cell wouldn't turn off, either.  *Id.*

Salley submitted four grievances about the medical care, his religious dietary restrictions, his disability, and the living conditions on June 8, 2018.  *See* Pl.'s Statement of Additional Undisputed Facts, at ¶ 3 (Dckt. No. 87); IDOC's Resp. to Pl.'s Local Rule 56.1(b)(3)(C) Additional Statement of Facts, at ¶ 9 (Dckt. No. 89).  Salley's grievance counselor entered the

grievances as received on June 13, 2018. *See* Exner's Resp. to Pl.'s Statement of Additional Undisputed Facts, at ¶ 4 (Dckt. No. 90); Cumulative Counseling Summ. (Dckt. No. 84-1, at 5 of 21). The grievances were assigned grievance numbers 4400, 4421, 4422, and 4428. *See* Exner's Resp. to Pl.'s Statement of Additional Undisputed Facts, at ¶ 4; IDOC's Resp. to Pl.'s Local Rule 56.1(b)(3)(C) Additional Statement of Facts, at ¶ 10.

That's when things get a little murky. The four grievances are not in the record, because the parties apparently don't have them. Salley did not retain copies of the grievances. *See* Exner's Resp. to Pl.'s Statement of Additional Undisputed Facts, at ¶ 5 (Dckt. No. 90); IDOC's Resp. to Pl.'s Local Rule 56.1(b)(3)(C) Additional Statement of Facts, at ¶ 11 (Dckt. No. 89). And the IDOC didn't keep copies, either. *See* Exner's Resp. to Pl.'s Statement of Additional Undisputed Facts, at ¶ 9; IDOC's Resp. to Pl.'s Local Rule 56.1(b)(3)(C) Additional Statement of Facts, at ¶ 16. It is not clear which grievance covered what issue, let alone what each grievance said.

The only record of the four grievances comes from Salley's grievance counselor. *See* Cumulative Counseling Summ. (Dckt. No. 84-1, at 5 of 21). The counselor recorded her receipt of the grievances in a form titled "Cumulative Counseling Summary," including a description of the four grievances. But each description is limited to a few generic words. Grievance 4400 "concern[ed] Staff/Medical/Others." *See id.* Grievances 4421 and 4422 each "concern[ed] Staff/Medical/ADA." *Id.* Grievance 4428 "concern[ed] Staff/Other." *Id.*

It is unclear what happened to Grievances 4400, 4421, 4422, and 4428. The IDOC claims that it returned them to Salley on June 19. *See* IDOC's Resp. to Pl.'s Local Rule 56.1(b)(3)(C) Additional Statement of Facts, at ¶ 14 (Dckt. No. 89); Exner's Resp. to Pl.'s Statement of Additional Undisputed Facts, at ¶ 7 (Dckt. No. 90); *see also* Cumulative

4

Counseling Summ. (Dckt. No. 84-1, at 5 of 21). But Salley claims that he never received the grievances, and never received any response to the merits of his claims. *See* IDOC's Resp. to Pl.'s Local Rule 56.1(b)(3)(C) Additional Statement of Facts, at ¶ 15; Exner's Resp. to Pl.'s Statement of Additional Undisputed Facts, at ¶ 8.

The only grievance in the record is the fifth grievance, which Salley attached to the complaint. *See* Grievance 4515 (Dckt. No. 6, at 18–20 of 31). Salley filled out that grievance on June 12 and signed it on June 15. *Id.*; *see also* Pl.'s Resp. to IDOC's Statement of Undisputed Material Facts, at ¶¶ 7, 11 (Dckt. No. 83). He submitted it as an emergency grievance. *Id.*

The fifth grievance replowed some of the old ground. It repeated two of the issues – Salley's disability and fall down the stairs, and the living conditions in his cell. Salley explained that he slipped and fell down the stairs while heading to the showers. *See* Grievance 4515 (Dckt. No. 6, at 20 of 31). He claimed that he told numerous officials about his low gallery permit, but they ignored his requests for disability accommodations. *Id.* He also described the unsanitary conditions of his cell, and the prison staff's refusal to provide cleaning supplies. *Id.* The fifth grievance did not mention the other two issues, meaning the lack of medical care for his suicidal feelings and the failure to accommodate his religious beliefs. *See id.*; *see also* Pl.'s Resp. to IDOC's Statement of Undisputed Material Facts, at ¶ 11 (Dckt. No. 83).

Before he received responses to any of his grievances, Salley briefly left Stateville NRC. *See* Exner's Resp. to Pl.'s Statement of Additional Undisputed Facts, at ¶ 6 (Dckt. No. 90); IDOC's Resp. to Pl.'s Local Rule 56.1(b)(3)(C) Additional Statement of Facts, at ¶ 13 (Dckt. No. 89). He was gone for 10 days – he went to the Cook County Detention Center on June 15 for a court date, and returned to Stateville NRC on June 25. *See* Exner's Resp. to Pl.'s Statement of

Additional Undisputed Facts, at ¶ 6; IDOC's Resp. to Pl.'s Local Rule 56.1(b)(3)(C) Additional Statement of Facts, at ¶ 13.

In the interim, on June 19, the Stateville NRC Grievance Department received the fifth grievance, meaning the emergency grievance from June 15 (Grievance 4515).[1] *See* IDOC's Statement of Undisputed Material Facts, at ¶ 12 (Dckt. No. 68); Exner Local Rule 56.1 Statement of Facts, at ¶ 17 (Dckt. No. 64); IDOC's Resp. to Pl.'s Local Rule 56.1(b)(3)(C) Additional Statement of Facts, at ¶ 17 (Dckt. No. 89). On June 21, the Grievance Department determined that Salley's claims did not merit an emergency review. *See* Pl.'s Resp. to IDOC's Statement of Undisputed Material Facts, at ¶ 12 (Dckt. No. 83); Pl.'s Resp. to Exner's Local Rule 56.1 Statement of Facts, at ¶ 17 (Dckt. No. 86). So, the Grievance Department sent it back, and instructed Salley to resubmit the grievance as a non-emergency.

Then, somehow, the Grievance Department received Grievance 4515 as a non-emergency grievance on June 22, even though Salley was not at the facility. *See* Pl.'s Resp. to IDOC's Statement of Undisputed Facts, at ¶ 12 (Dckt. No. 83); Pl.'s Resp. to Exner's Local Rule 56.1 Statement of Facts, at ¶ 17 (Dckt. No. 86); IDOC's Resp. to Pl.'s Local Rule 56.1(b)(3)(C) Additional Statement of Facts, at ¶ 18 (Dckt. No. 89). Again, he went to the Cook County Detention Center on June 15, and did not return to Stateville NRC until June 25. *See* Exner's Resp. to Pl.'s Statement of Additional Undisputed Facts, at ¶ 6 (Dckt. No. 90); IDOC's Resp. to Pl.'s Local Rule 56.1(b)(3)(C) Additional Statement of Facts, at ¶ 13.

Salley permanently left Stateville NRC on July 3, 2018. *See* Pl.'s Statement of Additional Undisputed Facts, at ¶ 10 (Dckt. No. 87); IDOC's Resp. to Pl.'s Local Rule

---

[1] Salley disputes that the Grievance Department received Grievance 4515 on June 19. *See* Pl.'s Resp. to Exner's Local Rule 56.1 Statement of Facts, at ¶ 17 (Dckt. No. 86). He argues that the date must be incorrect because he left the facility four days earlier. *Id.* It's possible that the facility received his submission a few days after he left. Maybe it took a few days to work its way through the pipeline. In any event, it is not important when, exactly, the Grievance Department received Grievance 4515.

56.1(b)(3)(C) Additional Statement of Facts, at ¶ 19 (Dckt. No. 89). When he arrived at his new facility (Illinois River), he received Grievance 4515 and the denial of its emergency status. *See* IDOC's Resp. to Pl.'s Local Rule 56.1(b)(3)(C) Additional Statement of Facts, at ¶ 20. But it appears that no one in the Grievance Department considered the merits. The form lacked comments from any institutional authority, and the "Counselor Response" section of the grievance was left blank. *See* Pl.'s Resp. to IDOC's Statement of Undisputed Material Facts, at ¶ 15 (Dckt. No. 83); Pl.'s Resp. to Exner's Local Rule 56.1 Statement of Facts, at ¶ 19 (Dckt. No. 86); *see also* Grievance 4515 (Dckt. No. 6, at 19 of 31).

Salley sent Grievance 4515 to the Administrative Review Board (the "ARB" or the "Board") on July 6. *Id.* at ¶ 21. He included a letter explaining that, because he was transferred to a new facility, he had no remedies available to resolve the grievance. *See* 7/6/18 Letter (Dckt. No. 84-1, at 12 of 21). The ARB received Salley's letter and Grievance 4515 on July 11, 2018. *See* Pl.'s Resp. to IDOC's Statement of Undisputed Material Facts, at ¶ 13 (Dckt. No. 83); Pl.'s Resp. to Exner's Local Rule 56.1 Statement of Facts, at ¶ 18 (Dckt. No. 86); IDOC's Resp. to Pl.'s Local Rule 56.1(b)(3)(C) Additional Statement of Facts, at ¶ 22 (Dckt. No. 89).

The ARB returned the grievance to Salley, noting that it lacked responses from a grievance officer and the chief administrative officer. *See* IDOC's Resp. to Pl.'s Local Rule 56.1(b)(3)(C) Additional Statement of Facts, at ¶ 23 (Dckt. No. 89). Basically, the ARB told Salley that it needed more information before it could consider Grievance 4515 on the merits. *See* Pl.'s Resp. to IDOC's Statement of Undisputed Material Facts, at ¶ 14 (Dckt. No. 83); Pl.'s Resp. to Exner's Local Rule 56.1 Statement of Facts, at ¶ 18 (Dckt. No. 86).

The ARB's form stated that the "attached grievance or correspondence is being returned for the following reasons." *See* ARB Return Form (Dckt. No. 84-1, at 14 of 21). The form then

included three sections, entitled "Additional information required," "Misdirected," and "No further redress." *Id.* Within each section, the form included sentences with boxes that the ARB could check. By checking the boxes, the ARB explained why, exactly, it was returning the grievance, and what the inmate needed to do.

In response to Salley's appeal, the ARB checked two boxes in the section entitled "Additional information required." By checking the first box, the ARB directed Salley to "[p]rovide your original written Offender's Grievance, DOC 0046, <u>including the counselor's response</u>." *Id.* (handwritten underline in original). The ARB also directed Salley to "[p]rovide a copy of the Response to Offender's Grievance, DOC 0047, <u>including the Grievance Officer's and Chief Administrative Officer's response, to appeal; if timely</u>." *Id.* (handwritten underline in original). The ARB did not check the box requesting dates. *Id.*

Importantly, the ARB also did not check the final box in that section: "Unable to determine nature of grievance or correspondence; submit additional specific information. Please return the attached grievance or correspondence with the additional information requested to: Administrative Review Board" at a specific address in Springfield, Illinois. *Id.* In short, the ARB told Salley that it needed more information, but did not tell Salley where to send it.

The ARB also checked one box in the "Misdirected" section, too. The ARB checked the box stating: "Personal property and <u>medical issues are to be reviewed at your current facility prior to review by the Administrative Review Board</u>." *Id.* (handwritten underline in original).

Salley apparently did not submit the requested information to the ARB. The ARB, in turn, did not issue a report with its findings and recommendations. The IDOC Director did not make a final determination, either.

8

Instead, Salley filed his *pro se* complaint on August 20, 2018, a little more than a month after the ARB returned Grievance 4515. *See generally* Cplt. (Dckt. No. 1). During discovery, the IDOC produced a copy of Salley's ARB records. *See* Pl.'s Resp. to IDOC's Statement of Undisputed Material Facts, at ¶ 8 (Dckt. No. 83). The ARB records don't show that Salley filed four grievances on June 8, 2018. *Id.* at ¶ 9; Pl.'s Resp. to Exner's Local Rule 56.1 Statement of Facts, at ¶ 14 (Dckt. No. 86). In fact, the ARB records reflect only one grievance related to Salley's time at Stateville NRC: Grievance 4515. *See* Exner Local Rule 56.1 Statement of Facts, at ¶ 15 (Dckt. No. 64); IDOC's Statement of Undisputed Material Facts, at ¶ 10 (Dckt. No. 68).

In other words, there's no evidence that Salley appealed Grievances 4400, 4421, 4422, and 4428. Salley acknowledges as much; he admits that he didn't appeal any of the four grievances to the ARB. *See* Pl.'s Resp. to Exner's Local Rule 56.1 Statement of Facts, at ¶ 16 (Dckt. No. 86). Salley admits that if he "filed a grievance on June 8, 2018 he did not appeal the finding of that grievance to the ARB." *See* Exner's Local Rule 56.1 Statement of Facts, at ¶ 16 (Dckt. No. 64); Pl.'s Resp. to Exner's Local Rule 56.1 Statement of Facts, at ¶ 16 ("Undisputed.").

The question now is whether Salley exhausted his administrative remedies and thus can bring his claims in federal court.

### Legal Standard

Rule 56 provides that the Court "shall grant" summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  The substantive law controls which facts are material.  *Id.*  After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 250 (internal quotations omitted).

The Court "'consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment.'"  *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted).  The Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in his favor."  *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted).

## Analysis

The Prison Litigation Reform Act requires prisoners to exhaust administrative remedies before bringing an action under section 1983.  *See* 42 U.S.C. § 1997e(a); *Pavey v. Conley*, 544 F.3d 739, 740 (7th Cir. 2008).  "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law . . . until such administrative remedies as are available are exhausted."  *See* 42 U.S.C. § 1997e(a).

The language of the statute is "mandatory."  *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016).  An inmate "shall" bring "[n]o action" without first exhausting administrative remedies.  *See* 42 U.S.C. § 1997e(a).  The statutory text leaves no room for judge-made exceptions.  *See Ross*, 136 S. Ct. at 1856–57.  Judicial discretion is out the door.  *Id.*  "Time and again," the Supreme Court "has taken such statutes at face value – refusing to add unwritten limits onto their rigorous textual requirements."  *Id.* at 1857.

But the text does include one "written" limitation.  The administrative remedy must be "available" to the inmate.  *See* 42 U.S.C. § 1997e(a).  "An inmate, that is, must exhaust available

remedies, but need not exhaust unavailable ones." *Ross*, 136 S. Ct. at 1858. An administrative remedy is "available" if the grievance procedure is "'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)).

The Supreme Court offered several examples of unavailable administrative remedies, adding that they "will not often arise." *Id.* An administrative remedy is unavailable if it is a "simple dead end," meaning that the administrative body regularly declines to exercise its authority. *Id.* Another example is a process that is "so opaque" that "no ordinary prisoner can discern or navigate it." *Id.* Finally, an administrative remedy is unavailable when prison officials "thwart inmates" from pursuing the process "through machination, misrepresentation, or intimidation." *Id.* at 1860.

To exhaust administrative remedies, a prisoner must file a grievance and follow the prison's administrative rules. *See King v. McCarty*, 781 F.3d 889, 893 (7th Cir. 2015) ("A prisoner must comply with the specific procedures and deadlines established by the prison's policy."); *see also Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006); *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). Courts strictly interpret section 1997e's exhaustion requirement. *See Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016). In fact, "[u]nexhausted claims are procedurally barred from consideration." *Id.* "Close enough" isn't good enough.

Exhaustion is not a technicality – it's an important step that promotes the meaningful resolution of disputes. Exhaustion gives prison officials and inmates a boots-on-the-ground chance to solve a problem in the short term, and thus achieve a workable fix without resorting to litigation. *See Jones v. Bock*, 549 U.S. 199, 219 (2007); *Woodford v. Ngo*, 548 U.S. 81, 95 (2006). Inmates must allow the administrative process to run its course before running to the courthouse. Litigation is the last stop, not the first step.

Failure to exhaust is an affirmative defense, so Defendants have the burden of proof. *See Jones*, 549 U.S. at 216. "Procedurally speaking, the Seventh Circuit has instructed the district courts in this circuit that as a matter of best practices, the issue of exhaustion should be resolved at the start of the case, before pretrial discovery begins." *Bruce v. Ghosh*, 2015 WL 1727318, at *4 (N.D. Ill. 2015) (citing *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008)). A court usually resolves exhaustion issues through a *Pavey* hearing. *Id.* Here, all of the Defendants raised exhaustion as an affirmative defense. *See* Clark Answer, at 22 (Dckt. No. 25); IDOC Answer, at 21 (Dckt. No. 40); Exner Answer, at 24–25 (Dckt. No. 53). None of them, however, informed the Court that they intended to pursue an exhaustion argument before filing their summary judgment motions.

Given *Pavey*'s holding that "exhaustion is not a question for the jury at trial," the Court is left with two options. *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). The Court can deny the motion for summary judgment without prejudice and conduct a *Pavey* hearing. *Id.* at 588; *Roberts v. Neal*, 745 F.3d 232, 234 (7th Cir. 2014). Or, "if the court can resolve the question of exhaustion based on the . . . documentary evidence," a hearing is "unnecessary" and the Court may simply rule on the motions. *Nesbitt v. Villanueva*, 2011 WL 737617, at *3 (N.D. Ill. 2011). The Court will look at the evidence in the record to determine if a *Pavey* hearing is necessary.

## I. Stateville NRC's Grievance Process

"State law determines the administrative remedies that a state prisoner must exhaust for PLRA purposes." *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016). "Because Stateville [NRC] is an Illinois Department of Corrections facility, its grievance procedure is governed by Illinois's Administrative Code." *See Lewis v. Pfister*, 2019 WL 5577164, at *1 (N.D. Ill. 2019); 20 Ill. Admin. Code § 504.800. To meet the exhaustion requirement, Salley had to take all steps

12

required by Stateville NRC's grievance system. *See Ford v. Johnson*, 362 F.3d 395, 397 (7th Cir. 2004).

Stateville's grievance procedure requires inmates to overcome several hurdles. For "normal problems," inmates must follow a three-step process. *Williams v. Wexford Health Sources, Inc.*, 957 F.3d 828, 831 (7th Cir. 2020); *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016). Basically, the process involves a grievance counselor, a grievance officer, and an appeal to the Administrative Review Board.

The inmate must kick off the process by filing a grievance with his grievance counselor. *See* 20 Ill. Admin. Code § 504.810(a). If the inmate can't resolve the issue with his counselor, he must take step two and submit a written grievance to a grievance officer. *See id.*; *see also Pyles*, 829 F.3d at 864; 2/25/20 Leung Email (Dckt. No. 84-1, at 16 of 21).

The officer reviews the grievance and provides the inmate with a written response. *See* 20 Ill. Admin. Code § 504.830(a). The grievance officer also sends recommendations to the chief administrative officer. *Id.* at § 504.830(e). When it is "reasonably feasible under the circumstances," the chief administrative officer reviews the officer's findings and informs the inmate of the outcome within two months. *Id.*

If the chief administrative officer (usually the warden) denies the grievance, and the inmate remains unsatisfied, he may proceed to step three: an appeal to the IDOC's Director. *Williams*, 957 F.3d at 832. "If . . . the offender still believes that the problem . . . has not been resolved to his or her satisfaction, he or she may appeal in writing to the Director." *Id.* at § 504.850(a). The Director, in turn, relies on the review and recommendation of the Administrative Review Board. *Id.*

The Administrative Review Board must receive the appeal within 30 days of the chief administrative officer's decision. *Id.* The inmate must include a copy of the grievance officer's report, as well as the chief administrative officer's decision. *Id.*

The Board "shall submit to the Director a written report of its findings and recommendations." *Id.* at § 504.850(d). The Director, in turn, "shall review the findings and recommendations of the Board and make a final determination of the grievance within six months after receipt of the appealed grievance, when reasonably feasible under the circumstances." *Id.* at § 504.850(e). So an appeal to the ARB includes both "findings and recommendations of the Board," as well as a "final determination" by the Director. *Id.*

There are other routes to the ARB, too, other than an appeal. For purposes of this case, the most important route involves inmates who relocate to another facility. A prisoner who transfers to a new facility can submit a grievance to the ARB about the old facility. "Offenders shall submit grievances directly to the Administrative Review Board when grieving: . . . (4) Other issues that pertain to a facility other than the facility where the offender is currently assigned, excluding personal property and medical issues." *Id*. at § 504.870(a).

There is an expedited procedure for emergencies. If there is a "substantial risk of imminent personal injury," the inmate may request that his grievance be handled on an emergency basis. *Id.* at § 504.840(a). The chief administrative officer determines if the grievance requires emergency handling. *Id.* at § 504.840(c). If the officer finds that there is an emergency, the chief administrative officer responds to the grievance on the merits. *Id.* at § 504.840(b). But if the officer finds that there is no emergency, the officer notifies the prisoner and tells him to resubmit the grievance through the normal channels. *Id.* at § 504.840(c).

14

A prisoner must complete the administrative grievance process to satisfy section 1997e's exhaustion requirement. *Lockett v. Bonson*, 937 F.3d 1016, 1025 (7th Cir. 2019); *Pozo v. McCaughtry*, 286 F.3dd 1022, 1025 (7th Cir. 2002). Substantial compliance with the rules is not enough. *Lewis v. Washington*, 300 F.3d 829, 833–34 (7th Cir. 2002). A prisoner can bring claims to court only after working his way through all available remedies. *See Porter v. Nusssle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life."); *Perez v. Wisconsin Dep't of Corr.*, 182 F.3d 532, 535 (7th Cir. 1999).

The four issues in the five grievances are situated a little differently, so the Court will take up each one in turn.

### A.     Salley's Mental Health Claim

Salley claims that he filed a grievance with his counselor on June 8, 2018, about his visit with Defendant Exner and his suicidal feelings. *See* Pl.'s Statement of Additional Undisputed Facts, at ¶ 3 (Dckt. No. 87). He claims that he received no response. But instead of following up, Salley sat on his hands, and did nothing. That is not exhaustion.

It is not clear which grievance covered this medical exam because the first four grievances are not in the record. The Counseling Summary shows that the counselor received four grievances on June 13, but the descriptions leave much to be desired. *See* Cumulative Counseling Summ. (Dckt. No. 84-1, at 5 of 21). Grievances 4400, 4421, and 4422 "concern[ed] Staff/Medical," and Grievance 4428 "concern[ed] Staff/Other." *Id.* The IDOC Defendants claim that they returned all four grievances – presumably including the one about Exner and Salley's suicidal feelings – on June 19. *See* Exner's Resp. to Pl.'s Statement of Additional Undisputed Facts, at ¶ 7 (Dckt. No. 90). The fifth grievance didn't mention the suicidal feelings, so any complaint about that issue appeared in one of the first four grievances.

15

Still, Salley offered evidence that *one* of those four grievances covered his initial intake exam and his suicidal feelings. *See* Salley Decl., at ¶ 8 (Dckt. No. 87-1, at 21 of 21). He submitted a declaration that one of the grievances covered his medical exam about his mental health. *See* Pl.'s Statement of Additional Undisputed Facts, at ¶ 3 (Dckt. No. 87). Salley, the non-movant, presented admissible evidence that he submitted a grievance about the issue. That's good enough for summary judgment purposes, even if the grievance itself is missing from the record.

Salley's response to the exhaustion argument is simple. He claims that he didn't receive responses to Grievances 4400, 4421, 4422, and 4428, even though IDOC records indicate that they were returned on June 19. *See* Pl.'s Resp. to Exner's Mtn. for Summ. J., at 3 (Dckt. No. 85). He wasn't there when they were allegedly returned. Salley was housed at Cook County, not Stateville NRC, from June 15 to 25, 2018. *Id.* According to Salley, he never received the responses, so he had no remedies available to exhaust. *See id.* at 3–4.

Salley "assumed IDOC ignored his grievances." *Id.* at 4. So, as he sees it, the administrative remedies "therefore, were exhausted." *Id.* In effect, he argues that there was exhaustion by silence.

"The PLRA does not . . . demand the impossible. Remedies that are genuinely unavailable or nonexistent need not be exhausted." *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016); *see also Thorton v. Snyder*, 428 F.3d 690, 695 (7th Cir. 2005) ("The requirement to exhaust all available remedies requires that *some* remedy is available to an inmate through the administrative process, even if not necessarily the relief desired.") (cleaned up) (emphasis in original). A remedy becomes unavailable "if prison employees do not respond to a properly filed

grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

But a prisoner may not simply sit on his hands and abandon the grievance process when he receives no response. *See Hill v. Bond*, 2015 WL 1166053, at *3 (N.D. Ill. 2015) ("Finding exhaustion when an inmate sat on his hands would not maintain the incentive to pursue agency adjudication."). Instead, the prisoner must take proactive steps to complete the grievance process. *See, e.g.*, *Figueroa v. Corr. Officer Mason*, 2016 WL 5477528, at *3 (N.D. Ill. 2016) ("[A]n inmate may not proceed directly to the courts when he does not receive an immediate response to his grievance; . . . he must 'follow up' with prison authorities, especially if he is familiar with the grievance process."); *Hill*, 2015 WL 1166053, at *3 ("[C]ourts in this district have held that inmates fail to exhaust if they do nothing – do not follow up, do not ask for instruction, or fail to pursue the issue in any way – after hearing no response to the grievance."); *Goldmsith v. Zolecki*, 2013 WL 5699302, at *6 (N.D. Ill. 2013) ("Simply submitting a grievance and not receiving a response is insufficient to establish that the grievance process is unavailable."); *Taylor v. Cook County*, 2013 WL 2285806, at *4 (N.D. Ill. 2013) (same); *Logan v. Emerson*, 2012 WL 3292829, at *5 (N.D. Ill. 2012) (Plaintiff "provided no evidence . . . that he followed up, sought instruction as to how to exhaust a lost grievance, or pursued the issue in any way.").

There is a dispute about whether the IDOC returned the four grievances. But there is no issue about a critical point: Salley did not pursue them. Salley provides no evidence that he followed up about Grievances 4400, 4421, 4422, and 4428. He simply "assumed IDOC ignored his grievances." *See* Pl.'s Resp. to Exner's Mtn. for Summ. J., at 4 (Dckt. No. 85). After transferring out of Stateville NRC, Salley could have pressed his grievances with the ARB. But

Salley acknowledges that he didn't appeal any of the June 8 grievances to the Board. *See* Pl.'s Resp. to Exner's Local Rule 56.1 Statement of Facts, at ¶ 16 (Dckt. No. 86).

He did nothing to follow up. Doing nothing is not enough. "When an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion." *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016). Salley took no action when he received no response to the grievance about his medical care. He provides no evidence that he pursued any of the June 8 grievances or attempted to complete the administrative process. He didn't file a new grievance, or appeal, or even ask for an update.

Salley failed to exhaust his administrative remedies for his claim against Exner about his suicidal feelings. The Court grants Exner's motion for summary judgment.

### B. Salley's Religious Practices Claim

The same analysis applies to Salley's grievance about his inability to observe Ramadan. It is unclear which of the first four grievances involved his religious dietary restrictions. Salley claims that one of the four grievances he filed on June 8 – Grievances 4400, 4421, 4422, and 4428 – covered that issue. *See* Pl.'s Statement of Additional Undisputed Facts, at ¶ 3 (Dckt. No. 87).

Salley repeats the same argument about exhaustion. Once again, Salley argues that he "assumed IDOC ignored his grievances, and they, therefore, were exhausted." *See* Pl.'s Resp. to IDOC's Mtn. for Summ. J., at 8 (Dckt. No. 82).

The same answer applies. Salley needed to take an affirmative step and follow up with prison officials when he didn't receive a response. At best, Salley submitted a grievance, and then let it drop until he filed this lawsuit. Submitting a grievance, without more, is not enough.

Salley failed to exhaust his administrative remedies for the religion-based claims against the IDOC Defendants. The Court grants the IDOC Defendants' motion for summary judgment on the claim that the IDOC didn't accommodate Salley's religious dietary restrictions.

### C.     Salley's Disability and Condition-of-Confinement Claims

The outcome is different on the claims about the last two issues, meaning the claims about his disability and the living conditions. The outcome isn't different because Salley followed up with the prison officials about those issues. He didn't. (Or, at the very least, there's no evidence that he did.) Instead, the outcome is different because Salley raised those two issues in his fifth grievance (Grievance 4515), meaning the emergency grievance dated June 15, 2018. *See* Grievance 4515 (Dckt. No. 6, at 18–20 of 31). He then elevated those issues to the ARB. He pressed the issue until, under Seventh Circuit case law, there was no clear path forward.

In the fifth grievance, Salley described a fall that injured his right hand and aggravated a chronic back condition. *See id.* at 20 of 31. Salley attributed the incident to the IDOC's failure to accommodate his disability. *See id.* Salley also complained that his cell was covered in rat feces and that prison staff deprived him of cleaning and hygiene supplies. *Id.*

The parties digress on a side issue about who resubmitted his grievance as a non-emergency grievance to Stateville NRC's Grievance Department. It is unclear who, exactly, resubmitted his grievance when Salley wasn't at the facility. In the end, it is neither here nor there. The more important fact is that he left Stateville NRC and later appealed to the ARB. The transfer and subsequent appeal to the ARB changes the exhaustion analysis.

Salley filed the emergency grievance, and then temporarily left Stateville NRC a short while later. *See* IDOC's Resp. to Pl.'s Local Rule 56.1(b)(3)(C) Additional Statement of Facts, at ¶ 13 (Dckt. No. 89). While he was gone, Stateville NRC's Grievance Department considered the fifth grievance on June 21 and determined that it wasn't an emergency. *See* Pl.'s Resp. to

19

IDOC's Statement of Undisputed Material Facts, at ¶ 12 (Dckt. No. 83). The Cumulative Counseling Summary shows that the IDOC returned Grievance 4515 to Salley by institutional mail on June 22. *See* Cumulative Counseling Summ. (Dckt. No. 84-1, at 5 of 21). That same day, the Grievance Department received Grievance 4515 again, even though Salley wasn't at the facility. *See* IDOC's Statement of Undisputed Material Facts, at ¶ 12 (Dckt. No. 68); *see also* Grievance 4515 (Dckt. No. 6, at 19 of 31).

The IDOC Defendants construct an argument based on the (disputed) fact that Salley re-submitted Grievance 4515 as a non-emergency grievance. As they see it, the resubmission of the grievance using standard, non-emergency procedures means that they needed to have a chance to respond. *See* IDOC's Mem. of Law, at 7 (Dckt. No. 69). In their view, Salley jumped the gun by raising the grievance with the ARB before receiving responses from the grievance officer and chief administrative officer. *Id.*

Salley responds by undermining the key premise of the argument – the notion that he resubmitted the grievance at all. Salley argues that he didn't resubmit the grievance using the standard procedure. And in fact, he *couldn't* have resubmitted the grievance on June 22 because he wasn't even there. *See* Pl.'s Resp. to IDOC's Mtn. for Summ. J., at 6 (Dckt. No. 82). He left the facility on June 15 and didn't return until June 25. *See* IDOC's Resp. to Pl.'s Local Rule 56.1(b)(3)(C) Additional Statement of Facts, at ¶ 13 (Dckt. No. 89). Salley believes that the "IDOC itself relogged the same grievance as received for a second time on June 22, 2018 without informing Plaintiff." *See* Pl.'s Resp. to IDOC's Mtn. for Summ. J., at 6 (Dckt. No. 82).

The issue is a long tour of a cul de sac. Whether Salley exhausted the grievance procedure at Stateville NRC doesn't make a difference. Salley left that facility for good on July 3. *See* IDOC's Resp. to Pl.'s Local Rule 56.1(b)(3)(C) Additional Statement of Facts, at ¶ 19

(Dckt. No. 89). After his transfer, he appealed to the ARB. The transfer changed the game when it came to exhaustion.

The 2017 amendments to the IDOC's grievance procedures clarified what an inmate must do when prison officials reject the emergency status of a grievance. If a grievance isn't an emergency, a prisoner must resubmit the grievance as a non-emergency. *See* Ill. Admin. Code § 504.840(c). That is, an inmate typically must "resubmit the grievance as non-emergent, in accordance with the standard grievance process." *Id.*

But inmates can submit grievances directly to the ARB in four situations. One of them is a grievance about a former facility. "Offenders shall submit grievances directly to the Administrative Review Board when grieving: . . . (4) Other issues that pertain to a facility other than the facility where the offender is currently assigned, excluding personal property and medical issues." *See* Ill. Admin. Code § 504.870(a)(4). Transfer to another facility opens the door to an appeal to the Board.

That exception applies here. Salley submitted a grievance about his incarceration at a former facility, and the grievance about his disability and living conditions did not involve "property or medical issues."[2] *Id.* So, Salley could appeal directly to the ARB in light of his transfer.

Salley availed himself of the opportunity to raise his issues with the Board. He sent Grievance 4515 to the ARB on July 6. *See* IDOC's Resp. to Pl.'s Local Rule 56.1(b)(3)(C) Additional Statement of Facts, at ¶ 21 (Dckt. No. 89). He even included a letter explaining that he had to directly appeal to the ARB because of his transfer out of Stateville NRC. *See* 7/6/18 Letter (Dckt. No. 84-1, at 12 of 21).

---

[2] True, the failure to accommodate a disability allegedly led to an injury. But Salley isn't complaining about the medical care that he received. Instead, he is complaining about the failure to accommodate his disability (which, as it turns out, led to an injury).

The IDOC Defendants don't address the fact that Salley wasn't at Stateville NRC on June 22, when someone resubmitted Grievance 4515 to the Grievance Department. *See* IDOC Mem. of Law (Dckt. No. 69); IDOC Reply (Dckt. No. 88). More importantly, they don't address the fact that Salley had a right to raise his grievance with the ARB after his transfer. *See* IDOC Mem. of Law; IDOC Reply. In fact, Defendants appear to drop the exhaustion argument entirely as it relates to Grievance 4515, which is reason enough to deny the motion. *See generally* IDOC Reply.

There is, however, one final wrinkle. The ARB returned Grievance 4515 without considering its merits. *See* ARB Return Form (Dckt. No. 84-1, at 14 of 21). It asked Salley to provide responses from the Stateville NRC counselor, grievance officer, and chief administrative officer. *See id.* But those responses did not exist – Salley transferred facilities before he could resubmit Grievance 4515 and get responses from the prison officials. If the submission of the responses were a *sine qua non*, then Salley would have hit the end of the road, because the responses did not exist. *See Thorton v. Snyder*, 428 F.3d 690, 695 (7th Cir. 2005). "The exhaustion requirement . . . 'hinges on the availability of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones.'" *Reid v. Balota*, 962 F.3d 325, 329 (7th Cir. 2020) (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016)) (cleaned up). Salley couldn't submit non-existent responses.

Still, the ball was in Salley's court after the ARB asked for more information. He could have responded to the Board and let them know that the responses did not exist. Instead, he filed suit. So instead of completing the appeal, Salley resorted to litigation.

One might think that Salley failed to exhaust his remedies because he did not complete the appeal. After all, Salley could have responded to the Board's request for more information,

and then allowed the process to run its course. Even if Salley didn't have the information – he couldn't submit non-existent responses from the counselor and the officer – Salley could have said so, and informed the Board. Without a response from Salley, the appeal ended without a report from the Board, and without a final determination by the IDOC Director. *See* 20 Ill. Admin. Code § 504.850.

But remedies are not truly "available" to an inmate if the process is "so opaque" that "no ordinary prisoner can discern or navigate it." *Ross*, 136 S. Ct. at 1859. The ARB asked Salley for the grievance with the counselor's response, and asked for the response from the grievance officer, too. The requests weren't especially complicated: "[p]rovide your original written Offender's Grievance, DOC 0046, including the counselor's response," and "[p]rovide a copy of the Response to Offender's Grievance, DOC 0047, including the Grievance Officer's and Chief Administrative Officer's response, to appeal; if timely." *See* ARB Return Form (Dckt. No. 84-1, at 14 of 21).

"Provide 'X'" seems like a clear instruction. Still, the ARB didn't tell Salley what to do if "X" did not exist. The ARB also did not check the final box with the instruction to "return the attached grievance or correspondence with the additional information" to a specific address for the ARB. *Id.*

The Seventh Circuit addressed a similar issue in *Reid v. Balota*, 962 F.3d 325 (7th Cir. 2020). The inmate in *Reid* appealed a grievance to the ARB. *Id.* at 327–28. There, as here, the Board returned the appeal to the inmate and requested information, including the grievance with the counselor's response, and the form with the officer's response. *Id.* There, as here, the Board "did *not* check the box that stated, 'Please return the attached grievance or correspondence with

23

the additional information requested.'" *Id.* at 328 (emphasis in original). And there, as here, the

inmate could not submit the requested information because it did not exist. *Id.*

The Seventh Circuit held that administrative remedies were unavailable because the

prison's responses "so obscured the process that there was no conceivable next step for Mr. Reid

to take." *Id.* at 330. Among other things, the Board "did not check the box specifying that those

documents needed to be provided or that some explanation needed to be given for their absence."

*Id.* If Reid needed to explain why documents were missing from his appeal, "nothing in the

record shows that Mr. Reid could have known about that requirement." *Id.* So, "the prison's

communications were so obscure that they made further steps of its administrative process

unknowable and, thus, unavailable to Mr. Reid." *Id.* at 326–27.

The Seventh Circuit in *Reid* built upon its earlier decision in *Williams v. Wexford Health*

*Sources, Inc.*, 957 F.3d 828 (7th Cir. 2020). Like the inmate in *Reid*, the inmate in *Williams*

appealed an emergency grievance to the ARB. *See Williams,* 957 F.3d at 832. At that time

(before the 2017 amendments), the Illinois Administrative Code did not address how inmates

needed to proceed if the warden determined that a grievance was *not* an emergency. After the

warden rejected the grievance's emergency status, the inmate appealed directly to the ARB

instead of resubmitting the grievance under the standard procedure. *Id.*

There, as here, the Board returned the appeal to the inmate and requested information,

including the grievance with the counselor's response, and the form with the officer's response.

*Id.* at 832–33. That is, the Board requested information that an inmate would have only if the

inmate had followed the *standard* procedure. *Id.* at 833. But until then, no one ever told

Williams that he needed to follow the standard procedure if the warden found that there was no

24

emergency. So, in effect, the ARB told Williams to go back to square one, and thus added a procedural step that was not on the books.

The ARB "move[d] the goalposts" by requiring the inmate to follow the standard procedure. *Id.* at 835. The Seventh Circuit also found it "[i]mportant[]" that the ARB "did *not* mark the box saying '[u]nable to determine nature of grievance or correspondence; submit additional specific information . . . .'" *Id.* at 833 (italics and brackets in original); *see also id.* at 831 ("It did not tick the box that was available for simple requests for additional information.").

The Seventh Circuit held that administrative remedies were unavailable because the Board "create[d] a new procedural requirement for Williams . . . without any basis for such a step in the regulations." *Id.* at 833. When Williams filed his emergency grievance (again, before the 2017 amendments), there was no procedure for a prisoner to follow after the denial of an emergency grievance. *See id.* at 834. Nothing told the inmate to start over, and do things the normal way. So, in effect, the inmate had exhausted "all the steps the prison offer[ed]" because the prison was attempting to add new requirements.[3] *Id.* at 833. In the midst of a grievance, the prison could not add new steps and extend the walkway to federal court.

*Reid* and *William* dictate the same result here. The Board requested additional information from Salley. And Salley, like the inmates in *Reid* and *Williams*, did not provide the requested information because it did not exist. Under Seventh Circuit case law, Salley's failure

---

[3] In a concurring opinion in *Williams*, Judge Barrett questioned whether the majority's holding was consistent with the Supreme Court's recent explanation of the exhaustion requirements in *Ross v. Blake*, 136 S. Ct. 1850 (2016). *See Williams v. Wexford Health Sources, Inc.*, 957 F.3d 828, 835–37 (7th Cir. 2020). The Supreme Court in *Ross* rejected the notion that an inmate's "reasonable mistake" can excuse his failure to exhaust. *See Ross*, 136 S. Ct. at 1858 (rejecting a "special circumstances" exception to exhaustion requirements when a prisoner makes a "reasonable mistake"). "When an administrative process is susceptible to multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion." *Id.* at 1859. Here, one might argue that Salley's failure to respond to the ARB's request for more information was a "reasonable mistake" that cannot excuse the lack of exhaustion. Still, this Court is bound to follow *Williams* and *Reid*.

to pursue the appeal and offer an explanation cannot be held against him, because no one told Salley how to proceed if the information did not exist. Although Salley had to "take all the steps" that Stateville NRC offered, he did not have to "go beyond the established system and guess at some other way of attracting the attention of the prison authorities." *Id.* at 833–34. "[G]rievance procedures must be transparent." *Id.* at 834. No one told Salley what to do, so under *Reid* and *Williams*, the path forward was obscure and thus unavailable.

Based on the record, Salley did not need to do more to exhaust his administrative remedies before bringing suit here. The Court denies the IDOC Defendants' motion for summary judgment on Salley's claims about his disability and his living conditions.

**Conclusion**

The Court grants Defendant Exner's motion for summary judgment (Dckt. No. 63). Plaintiff did not exhaust his administrative remedies for his claim about inadequate mental health care. Defendant Exner is dismissed. The Court grants in part and denies in part the motion for summary judgment filed by the IDOC Defendants (Dckt. No. 67). The Court grants the IDOC Defendants' motion for summary judgment on the claim about his religious dietary restrictions because Plaintiff did not exhaust his administrative remedies. The Court denies the IDOC Defendants' motion for summary judgment on the claims about Plaintiff's disability and the living conditions of his cell.

Date: August 14, 2020

_____

Steven C. Seeger
United States District Judge