**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DONTANEOUS SALLEY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-5700 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| YRHYNEST PARKER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Dontaneous Salley was an inmate with the Illinois Department of Corrections for about three weeks in 2018. Salley took issue with the location and the condition of his cell. The IDOC assigned him to a cell on the second floor, even though he used a cane and received a low gallery permit. Salley also encountered a number of unpleasantries in his cell, including rat feces, dirty linens, and lights that wouldn't turn off.

Salley ultimately filed suit, bringing claims under the ADA and under the Cruel and Unusual Punishment Clause of the Eighth Amendment. He alleged that Defendants showed deliberate indifference to his serious medical needs, and subjected him to unconstitutional conditions of confinement. He also filed claims about a failure to accommodate his religion and his disability.

Defendants moved for summary judgment for lack of exhaustion, which the Court granted in part. Salley then filed an amended complaint, and Defendants filed a second motion for summary judgment on the merits. The latter motion is now before the Court.

For the reasons stated below, Defendants' motion for summary judgment is hereby granted.

**Background**

In June 2018, Plaintiff Dontaneous Salley was an inmate with the Illinois Department of Corrections. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 1 (Dckt. No. 125). He was housed at the Northern Reception and Classification Center at Stateville Correctional Center ("Stateville NRC") for around three weeks. *Id.* He was there from June 6 to 15, 2018, and from June 25 to July 3, 2018. *Id.* at ¶ 12.

Before entering Stateville NRC, Salley had some health issues. He suffered from wrist pain, spondylosis (degenerative arthritis of the spine), and left leg pain and weakness from prior gunshot wounds. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 1 (Dckt. No. 127). He needed a cane to get around. *Id.*

When Salley arrived at Stateville NRC, he told correctional officers about his physical ailments and his difficulties moving. *Id.* at ¶ 4. The prison has a practice of accommodating inmates with disabilities. *Id.* at ¶ 8. So, prison officials allowed Salley to use a cane and issued him a low gallery permit. *Id.* at ¶ 2; *see* Low Gallery Permit (Dckt. No. 6, at 29 of 31).

At Stateville NRC, a "gallery" is just another word for a floor. So the "first gallery" means the first floor, the "second gallery" means the second floor, and so on. *See* Farley Dep., at 14:24 – 15:3 (Dckt. No. 124-1, at 36–37 of 210). Each unit has three galleries, meaning three floors. *Id.* at 14:21 – 15:12.

Salley's low gallery permit didn't give a lot of details. It wasn't exactly chock-full of explanatory content for the interested reader. It didn't include specific directions about where, exactly, he was supposed to go, or what he was entitled to.

Basically, the low gallery permit was a one-page form, and it included a few headings. The relevant one read as follows: "Absolute Criteria for Low Gallery Permit." *See* Low Gallery

Permit (Dckt. No. 6, at 29 of 31). It included three boxes, and one of them was checked. That box read: "Crutches (Permanent/Temporary)." *Id.* In handwriting, the word "cane" appears. *Id.*

Salley had a cane, but not for long. Salley's cane was confiscated and replaced with a wooden crutch. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 3 (Dckt. No. 127).

The parties disagree about the meaning of the low gallery permit, including whether Stateville NRC complied with the permit. Salley believes that a low gallery permit entitled him to a cell on the first floor. According to Salley, the IDOC "failed to honor" his permit by placing him on the second floor, where he was the only inmate using an assistive device. *See* Pl.'s Statement of Facts, at ¶ 6 (Dckt. No. 126). As he tells it, a first-floor cell was available at the time of his cell assignment, but he didn't get it. *Id.* at ¶ 9. Salley complained, and explained that he had a medical permit, but the IDOC didn't budge. *Id.* at ¶¶ 5–6.

Defendants have a different take on the meaning of the low gallery permit, and on whether they complied. According to them, the second floor "is considered a low gallery," and an inmate who receives a low gallery permit "is authorized to be on either the first or second gallery." *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶¶ 6–7 (Dckt. No. 127). Stateville NRC's policy was to place inmates with low gallery permits in cells on the first floor, when possible. But if a cell on the first floor was unavailable, the inmate would be placed on the second floor. *Id.* at ¶ 8. As they tell it, there were no available cells on the first floor when Salley entered the prison. *Id.* at ¶ 9. So, based on Stateville NRC protocol, Salley was placed in a second-floor cell. *Id.* at ¶¶ 8–9.

The parties also offer conflicting evidence about the conditions of Salley's cell on the second floor. Salley testified that it contained rat feces, bloodied sheets, and blankets that smelled of urine. *See* Pl.'s Statement of Facts, at ¶ 6 (Dckt. No. 126). But Defendants offered

evidence that Stateville NRC cleans the cells on a regular basis, and that Salley's cell was cleaned before he entered his housing. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 6 (Dckt. No. 127). New inmates receive clean bedding, their initial clothing, a mattress, soap, a toothbrush, and toothpaste. *Id.*

In sum, the parties agree that Salley was housed on the second floor when he entered Stateville NRC. And they agree that he had a low gallery permit. But they disagree about whether the permit entitled Salley to reside on the first floor, and whether a first-floor cell was available when he entered the facility. And they disagree about the conditions of his second-floor cell.

Things took a turn for the worse a week after his arrival. On June 12, 2018, Defendant Cecil Whitfield, an IDOC correctional officer, arrived at Salley's cell to escort him to the showers. *Id.* at ¶ 11. Salley reminded Whitfield that he was not to be placed on the second-floor gallery. *Id.*

Salley then attempted to go down the stairs to the showers. *Id.* at ¶ 13. As Salley puts it, he "was then made" to walk down the stairs to the first-floor showers, despite the availability of showers on the second floor.[1] *See* Pl.'s Statement of Facts, at ¶ 12 (Dckt. No. 126).

The stairs leading from the second floor to the first floor had a railing. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 16 (Dckt. No. 125). According to Salley, he had his crutch in one arm and his shower gear in the other, so his hands were full. *Id.* As he tells it, it was "impossible" for him to hold the railing while walking down the steps, and he needed help. *Id.*

---

[1] Defendants dispute that there were showers on the second floor. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 12 (Dckt. No. 127). But Salley testified that there were showers on the second floor, so that testimony suffices to create an issue of fact. *See* Salley Dep., at 80:4-22 (Dckt. No. 122-1).

At deposition, counsel squarely asked Salley whether he ever told Whitfield that he needed help walking down the stairs. Salley could not remember ever asking for help. He testified: "I don't remember. I don't remember telling him that. I don't know. I probably did. I probably did. But if he was – I mean, me personally – I am walking with a crutch. I got my shower gear. I am walking down 15 steps. He seen my permit that I am not supposed to be up there. He should have known that common sense [sic] I needed to use the elevator. They had an elevator, too. Put that for the record. They got elevators at NRC that he could have put me in. There is an elevator that I could use. He didn't put me in an elevator. So I can't remember asking him for help or not. If I did, I probably put it in my complaint. I am not sure. I don't remember right now at this moment." *See* Salley Dep., at 77:19 – 78:9 (Dckt. No. 122-1).

Salley could not recall, one way or the other, whether he asked for help going down the stairs. He testified that he couldn't remember, so any testimony that he "probably" asked for help is simply a guess. And speculation is not evidence. *See Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("[The non-movant] is only entitled to the benefit of inferences supported by admissible evidence, not those supported by only speculation or conjecture.") (cleaned up). If he doesn't remember, then he doesn't remember. And if he doesn't remember, then he can't testify about it.

Salley then walked down the stairs. It is undisputed that Whitfield did not help Salley walk down the stairs. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 13 (Dckt. No. 127). And it is undisputed that Salley did not use the railing. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 16 (Dckt. No. 125).

Salley took a tumble. The record doesn't reveal how far Salley walked down the stairs before he fell. And the record does not shed light on how far he fell. But the bottom line is that

Salley fell, injuring his hand, wrist, and back. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶¶ 13, 17 (Dckt. No. 127).

After the fall, Salley received medical attention and pain medication. *Id.* at ¶ 14. And the prison re-assigned him to a new cell on the first floor. *Id.*

Three days later, on June 15, 2018, Salley submitted a written emergency grievance. *Id.* at ¶ 15. He argued that Stateville NRC had failed to accommodate his disability, and he detailed the events leading to his fall and injury. *Id.* Salley checked the box for "ADA Disability Accommodation" and wrote "Violation of Eighth Amendment / Deliberate Indifference" next to the "Other (specify)" box. *Id.* at ¶ 16; *see also* 6/15/18 Grievance, at 1 (Dckt. No. 124-1, at 9 of 210). He also complained about the conditions of his cell. He pointed to rat feces, lights that would not turn off, and a lack of cleaning supplies. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 17 (Dckt. No. 127); 6/15/18 Grievance, at 2.

Salley ultimately filed a *pro se* complaint under section 1983 against seven individual defendants who worked at Stateville NRC. *See* Cplt. (Dckt. No. 6). He sued six IDOC officers and one IDOC mental health professional. *Id.* at ¶¶ 4–8, 11–12.

His original complaint included four claims: (1) deliberate indifference to a serious medical condition; (2) failure to accommodate his religion; (3) failure to accommodate a disability; and (4) inhumane living conditions. *Id.* at ¶¶ 69–72, 74–76. The Court later appointed him counsel. *See* 3/26/19 Order (Dckt. No. 41).

Defendants moved for summary judgment on the limited issue of whether Salley had exhausted his administrative remedies before filing suit. *See* Defs.' Mtn. for Summ. J. (Dckt. No. 67). This Court granted in part and denied in part Defendants' motion for summary judgment. *See* 8/14/20 Mem. Opin. and Order (Dckt. No. 93). The Court concluded that Salley

had not exhausted his administrative remedies for his claim about inadequate mental health care or his request for religious accommodation, but he had exhausted his claims for his disability accommodation and his living conditions.  *Id.* at 26.

The Court dismissed one Defendant (Officer Hernandez), and granted summary judgment in favor of another Defendant (Exner, a mental health professional).  *See* 11/12/19 Order (Dckt. No. 59); 8/14/20 Mem. Opin. and Order, at 26 (Dckt. No. 93).  At that point, five individual Defendants remained:  Officers Whitfield, Parker, Leiby, Clark, and Farley.

In June 2021, Salley filed an amended complaint.  *See* Am. Cplt. (Dckt. No. 100).  The amended complaint included claims against seven defendants.  He included the same five IDOC correctional officers:  Whitfield, Parker, Leiby, Clark, and Farley.  But the amended complaint added Rob Jeffreys (the acting director of the IDOC), and the IDOC itself.

The amended complaint includes three counts.  Count I is a claim under the Americans with Disabilities Act ("ADA") against Jeffreys and the IDOC (only).  *Id.* at ¶¶ 41–51.  Count II is an inadequate medical care claim against the five IDOC correctional officers.  *Id.* at ¶¶ 51–60.  And Count III is an unconstitutional conditions of confinement claim against the five IDOC correctional officers.  *Id.* at ¶¶ 61–68.

After discovery, Defendants moved for summary judgment.  *See* Defs.' Mtn. for Summ. J. (Dckt. No. 119).

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

Salley brings three claims. Again, the first claim is an ADA claim against the IDOC and Jeffreys (the acting director) for failing to accommodate his disability. The second claim is an inadequate medical care claim against five IDOC officers for failing to place him in a first-floor cell. The third claim is an unconstitutional conditions of confinement claim against those five IDOC officers based on the conditions of his second-floor cell.

The Court will address each claim in turn.

## I.    Americans with Disabilities Act (Count I)

Count I is an ADA claim against the IDOC, and against Jeffreys in his official capacity. Salley alleges that they failed to meet his physical accessibility needs and failed to make

reasonable accommodations for his disability.  *See* Am. Cplt., at ¶¶ 45–46 (Dckt. No. 100).  He contends that Defendants discriminated against him based on his disability.  *Id.* at ¶ 47.

Defendants do not contest the merits of Salley's ADA claim.  Instead, they argue that Salley brought his claim too late.  The Court agrees.

"The ADA, like many federal civil rights statutes, does not contain a specific statute of limitations.  Thus, the most appropriate state limitations period applies."  *Norfleet v. Gaetz*, 820 F. App'x 464, 468 (7th Cir. 2020) (quoting *Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 550 (7th Cir. 1996)).  Salley's claim most closely resembles a personal injury claim, so the two-year statute of limitations for personal injuries under Illinois law applies.  *See Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1075 (7th Cir. 2013).

Salley's last day at Stateville NRC was July 3, 2018.  At that point, the IDOC couldn't accommodate his disability, because he wasn't there.  He needed to sue no later than two years after he left the building.  So he had until July 3, 2020 – meaning two years later – to bring his ADA claim.

Salley brought a timely failure to accommodate claim in his original complaint, which he filed in August 2018.  *See* Cplt., at ¶¶ 69–71 (Dckt. No. 6).  But that claim was not against Jeffreys (again, the acting director) or the IDOC itself.  Instead, it was against six individual IDOC officers, five of which remain in this case (Whitfield, Parker, Leiby, Clark, and Farley).  *Id.* at ¶¶ 4–7, 11–12.

Then, when he filed his amended complaint in June 2021, Salley dropped the failure to accommodate claim against the original Defendants.  Instead, he brought a failure to accommodate claim against Jeffreys and the IDOC (only).  *See* Am. Cplt., at ¶ 45 (Dckt. No. 100).

9

So, in the amended complaint, he switched the defendants on his failure to accommodate claim under the ADA.  The original complaint named Whitfield, Parker, Leiby, Clark, Farley, and Hernandez, but the amended complaint named Jeffreys and the IDOC (only) and dropped the others.

Jeffreys and the IDOC argue that Salley missed the statute of limitations on his ADA claim by almost one year.  In other words, the IDOC and Jeffreys argue that he needed to add them as defendants by July 2020.  But Salley named them as defendants in June 2021.

Salley responds that the ADA claim relates back to the date of his original complaint.  He filed that complaint in August 2018, only two months after the alleged violation in June 2018.  In his view, the claims against the new Defendants relate back to that original filing.

An untimely claim can pass muster under the statute of limitations by latching onto a timely claim.  But not always.  Rule 15(c)(1) governs when an amended complaint that adds a new defendant relates back to the filing of an earlier complaint.  *See* Fed. Rule Civ. P. 15(c)(1).  The Rule sets up three hurdles that a plaintiff must overcome.

The first is a shared subject matter.  "An amendment to a pleading relates back to the date of the original pleading when:  . . . (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied. . . ."  *See* Fed. R. Civ. P. 15(c)(1)(C).  Rule 15(c)(1)(B), in turn, provides that the amendment must assert a claim arising out of the same "conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading."  *See* Fed. R. Civ. P. 15(c)(1)(B).

If an amended complaint passes that first hurdle, a plaintiff must overcome two more.  An amended complaint relates back to an earlier complaint if the new defendant "(i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew

or should have known that the action would have been brought against it, but for a *mistake* concerning the proper party's *identity*." *See* Fed. R. Civ. P. 15(c)(1)(C)(i)–(ii) (emphasis added).

Here, Salley has not satisfied the last requirement.

An amended complaint does not relate back to an earlier complaint simply because a plaintiff believes that it was a mistake not to include someone as a defendant. Only certain mistakes count. Mere oversights don't count. Neither do tactical mistakes.

"The text of the Rule expressly requires a case of mistaken identity." *See McMurtry v. Wexford Health Sources, Inc.*, 2021 WL 1165102, at *12 (N.D. Ill. 2021). Relation back applies only if the new defendant knew or should have known that it would have been sued "but for a *mistake* concerning the proper party's identity." *See* Fed. R. Civ. P. 15(c)(1)(C)(ii) (emphasis added).

There is nothing in Salley's original complaint, or amended complaint, suggesting the presence of a mistake. Salley originally chose to sue six individual defendants who worked at Stateville NRC. That complaint involved defendants' alleged failure to accommodate his disability. The record does not suggest that he sued those individuals mistakenly when he meant to sue Jeffreys and the IDOC. It is not as if he mixed up the defendants, or got their names wrong, or otherwise confused one person for another.

The amended complaint reads like Salley simply changed his mind about who to sue. He didn't swap defendants because he mistakenly believed, in the original complaint, that one of the original defendants was the director of the IDOC. It is not as if the original complaint alleged that Whitfield, Parker, Leiby, Clark, Farley, or Hernandez was the IDOC director. The amended complaint reflects a change of heart and change of mind: instead of suing individual officers

11

(Whitfield, Parker, Leiby, Clark, Farley, and Hernandez), he sued the director of the IDOC (Jeffreys) and the IDOC itself.

But "[c]hanging one's mind about who to sue – or making a tactical decision to expand the boundaries of the lawsuit to add new defendants – does not qualify as mistaken identity." *See McMurty*, 2021 WL 1165102, at *12; *see also Webb v. Fillipitch*, 2022 WL 267907, at *5 (N.D. Ill. 2022) ("This is not a case of mistaken identity; Plaintiff simply changed his mind about who he wanted to sue.") (citing *McMurty*, 2021 WL 1165102, at *12).

Tellingly, Salley never argues that he made a mistake. His only reference to a mistake in his brief *denies* that he needs a mistake for relation back. *See* Pl.'s Resp., at 8–9 (Dckt. No. 124) (citing *Olech v. Village of Willowbrook*, 138 F. Supp. 2d 1036, 1042 (N.D. Ill. 2000)). That's not what the text of the rule says.

There is no basis for a finding that Salley failed to name certain defendants because of mistaken identity. So the claims against Jeffreys and the IDOC in the amended complaint do not relate back to the filing of the original complaint. And without relation back, Salley's ADA claims against them are untimely.

The Court grants summary judgment to Jeffreys and the IDOC on Salley's ADA claim. And again, there are no other defendants on Count I.

## II. Official Capacity Claims and Damages

Before getting into the merits of the next two claims, the Court needs to take a bit of a detour. The punchline is that Salley can't recover damages from the state employees in their official capacities.

In Counts II and III, Salley sues a number of IDOC correctional officers in their official capacities, and he seeks damages under section 1983. *See* Am. Cplt., at ¶¶ 5–9, 60, 68 (Dckt.

No. 100). There are five remaining Defendants for those claims – Officers Whitfield, Parker, Leiby, Clark, and Farley – all of whom are state employees. *Id.* at ¶¶ 5–9, 60, 68.

Salley brought claims against those Defendants in their official capacities. *Id.* at ¶¶ 5–9 (suing each Defendant "in his official capacity"). The amended complaint does not include claims against them in their individual capacities. At least not expressly. But in their briefs on the motion for summary judgment, the parties appear to operate under the assumption that the amended complaint named them in their individual capacities.

If Salley intended to bring official capacity claims against the Defendants, those claims would fail right out the gate. Section 1983 authorizes suits against a "person" who acts under color of state law and deprives another person of his or her rights. *See* 42 U.S.C. § 1983. A State is not a "person," so the statute does not allow suits against the State. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989). And an official capacity claim against a state officer is, really, "no different from a suit against the State itself." *Id.* at 71. As a result, a plaintiff cannot bring an official capacity claim for damages under section 1983 against a state official. *See Fritz v. Evers*, 907 F.3d 531, 533 (7th Cir. 2018); *Kolton v. Frerichs*, 869 F.3d 532, 535–36 (7th Cir. 2017).

Whitfield, Parker, Leiby, Clark, and Farley are employees of an Illinois state agency, so section 1983 does not authorize a suit for damages against them in their official capacities. *See Fritz*, 907 F.3d at 533. The Court therefore grants judgment to Defendants Whitfield, Parker, Leiby, Clark, and Farley to the extent that the amended complaint alleged official capacity claims for monetary damages.

Going forward, the Court treats Count II (inadequate medical care) and Count III (unconstitutional conditions of confinement) as claims against the officers in their individual capacities. The Court addresses those claims in turn.

## III.     Inadequate Medical Care (Count II)

Count II alleges that the five IDOC Defendants subjected him to cruel and unusual punishment in violation of the Eighth Amendment. Salley brings an inadequate medical care claim based on the officers' refusal to place him in a low gallery cell. The claim involves his first six days at the facility – recall that he went to the first floor after his fall.

Before diving into the claim, it is important to bear in mind what Salley is claiming, and what he is not claiming. Salley claims that Defendants provided inadequate medical care because he was housed on the second floor. The claim is about his placement on the second floor, meaning the location of his cell.

Salley is not claiming that Whitfield or anyone else is liable for refusing to help him walk down the stairs during the incident in question. The complaint does not contain a claim that the guards did not help Salley walk down the stairs. In a similar vein, Salley did not argue in his summary judgment briefs that Defendants are liable because they refused a request for help on the day in question. And the claim is not about his medical care after he took a spill, either.

In sum, the claim is about the decision to place Salley on the second floor, instead of the first floor. The claim is not about whether any of the guards refused a request for help walking down the stairs before Salley took a tumble. The claim is not about a refusal to help him and thus prevent a slip and fall. And it is not about his post-fall medical care.

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates." *See Balsewicz v. Pawlyk*, 963 F.3d 650, 654 (7th Cir. 2020)

14

(quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). "Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display deliberate indifference to serious medical needs of prisoners." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008).

"To establish a claim under the Eighth Amendment, a plaintiff must offer evidence of '1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition.'" *LaRue v. Obaisi*, 2021 WL 3290919, at *5 (N.D. Ill. 2021) (quoting *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011)). Courts refer to these two prongs as the "objective" and "subjective" elements. *See Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 766 (7th Cir. 2021).

The objective component means that a prisoner was "exposed to a harm that was objectively serious." *See Balsewicz*, 963 F.3d at 654. A medical condition is objectively serious "if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Bell v. Wexford Health Source, Inc.*, 2021 WL 4267503, at *3 (N.D. Ill. 2021) ("[T]he standard for conditions to be objectively 'serious' does not create a high bar.") (citation omitted).

The subjective component requires that the prison official "*actually* knew of and disregarded a substantial risk of harm" to an inmate. *See Richter v. Mitchell*, 2022 WL 1988986, at *3 (N.D. Ill. 2022) (emphasis in original) (quoting *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018)). This subjective standard "requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk." *See Huber v. Anderson*, 909 F.3d 201, 208 (7th Cir. 2018) (quoting *Figgs v. Dawson*, 829 F.3d 895, 902 (7th Cir. 2016)).

15

In their motion for summary judgment, Defendants assume that Salley suffered from an objectively serious medical condition.[2] *See* Defs.' Mem. in Supp. of Their Mtn. for Summ. J., at 6 (Dckt. No. 120). District courts frequently assume that a plaintiff satisfies the first element – a serious medical condition – when assessing inadequate medical care claims based on a prisoner's low gallery permit. *See, e.g.*, *Perez v. Wexford Health Sources, Inc.*, 2019 WL 5788073, at *7 (N.D. Ill. 2019); *Young v. Obaisi*, 2019 WL 1239876, at *4 (N.D. Ill. 2019); *Sharif v. Carter*, 2017 WL 3421554, at *11 (N.D. Ill. 2017); *Gonzalez v. Hardy*, 2015 WL 6528112, at *7 (N.D. Ill. 2015); *Harrison v. Wexford Health Servs., Inc.*, 2015 WL 3897526, at *6 (N.D. Ill. 2015).

Here, Salley suffered from several physical ailments that inhibited his ability to walk without a cane or crutch. For purposes of Defendants' motion for summary judgment, the Court assumes that Salley had an objectively serious medical condition.

That leaves the subjective element: whether Defendants knew of and disregarded a substantial risk of harm to Salley's health. Salley argues that all five IDOC Defendants were deliberately indifferent to his serious medical need when they failed to honor his low gallery permit and failed to assign him to a first-floor cell. *See* Pl.'s Statement of Facts, at ¶ 6 (Dckt. No. 126). All parties agree that assignment to a low gallery qualifies as medical treatment. *See, e.g.*, *Perez*, 2019 WL 5788073 at *7; *Sharif*, 2017 WL 3421554 at *11.

According to Salley, he told the officers about his low gallery permit. He showed them his permit, and repeatedly insisted that the permit prevented him from getting placed on the second floor. *Id.* at ¶ 17.[3] He also says that he communicated that he had difficulty walking, and

---

[2] Defendants say that they challenge the objective element, but their argument only discusses the subjective element. *See* Defs.' Mem. in Supp. of Their Mtn. for Summ. J., at 6 (Dckt. No. 120).
[3] Salley relies on his grievance to support the notion that he told all five Defendant officers about the low gallery permit. *See* Pl.'s Statement of Facts, at ¶ 17 (Dckt. No. 126). Defendants contend that this grievance is inadmissible hearsay. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 17 (Dckt. No. 127). At summary judgment, evidence does not need to be admissible in form; it only needs to be admissible in

that the "limitations in his ability to ambulate" were "visible and apparent." *Id.* at ¶ 4. But despite his protests, the officers refused to assign him a first-floor cell, allegedly ignoring a substantial risk of harm by forcing him to stay on the second floor.

Viewing the record in Salley's favor, he fails to put forward evidence that Defendants acted with deliberate indifference. *See Huber*, 909 F.3d at 208.

First, Salley relies on the existence of his low gallery permit to establish the officers' deliberate indifference to his medical need to be in a first gallery cell. *See* Pl.'s Statement of Facts, at ¶¶ 5–6, 10 (Dckt. No. 126). Yet Salley's permit says nothing about his medical condition, or about the reasons for his placement on the first or second floor. *See* Low Gallery Permit (Dckt. No. 6, at 29 of 31). The permit simply states, "Low Gallery Permit," and that Salley may use a cane. *Id.*

The parties dispute the meaning of "low gallery." But even if Salley's permit expressly said, "first floor only," the permit remains insufficient to show that the officers acted with deliberate indifference by keeping him on the second floor.

An inmate's medical permit does not dictate a court's analysis of inadequate medical care claims. Salley must establish both the objective and subjective elements of his Eighth Amendment claims. A medical permit "does not supplant that framework." *See Est. of Miller by Chassie v. Marberry*, 847 F.3d 425, 428 (7th Cir. 2017).

---

content. *See Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016). The statements in Salley's grievance are within his personal knowledge, and he can testify about them at trial. *See Rankin v. Wexford Health Sources, Inc.*, 2019 WL 3554543, at *6 (N.D. Ill. 2019). So, "even if the grievance[] would not be admissible at trial . . . [Salley's] testimony concerning the statements therein . . . would be admissible." *Id.*; *see also Williams v. Schwarz*, 2018 WL 1961143, at *9 (N.D. Ill. 2018) (considering statements in a prisoner's grievances at summary judgment because the prisoner would be allowed to testify about the statements at trial "independently of the grievance documents").

An officer's refusal to comply with an inmate's medical permit does not automatically establish the subjective element of Eighth Amendment claims. As other courts have noted, a medical permit "might call for treatment that is *beyond* what is required by the Eighth Amendment." *See Everett v. Baldwin*, 2016 WL 8711476, at *7 n.6 (N.D. Ill. 2016) (emphasis in original).

The Constitution sets a floor on the state's minimally acceptable treatment of inmates. A medical permit could entitle an inmate to better treatment *above* that floor, but it doesn't *raise* the floor.[4] That is, the Constitution does not necessarily require compliance with a permit.

Even if Salley's permit had said, "first floor only," that directive wouldn't be enough to satisfy the subjective prong of an inadequate medical care claim. The permit revealed nothing about why Salley was issued a cane, or what medical conditions he had, or how serious they were. The permit did not say why he had difficulty walking, or how much difficulty he had, or whether he had trouble with stairs. It didn't contain medical information. And there is no evidence that the officers knew of his degenerative arthritis or gunshot wounds.

In other words, showing a permit to the officers did not, on its own, give Defendants knowledge of a serious medical condition or a substantial risk to his health. *See Marberry*, 847 F.3d at 428 ("[Plaintiff] does not contend that the very existence of a lower-bunk assignment would convey to any conscientious prison employee the existence of a serious medical condition . . . . For all this record shows, medical personnel issue lower-bunk directives for reasons that do not imply the existence of a 'serious' health problem.").

---

[4] For instance, imagine a prison that gives medical permits for daily ice baths to inmates with broken ankles. If, one day, a guard refuses to provide an inmate with his bath, that refusal does not mean the guard inflicted cruel and unusual punishment. Not having a daily ice bath for a broken ankle is not cruel and unusual, independent of what any medical permit says. In simple terms, a permit granting an inmate special care does not mean that the prison must now abide by that permit, or else violate the Eighth Amendment.

Second, even if Salley's reliance on a crutch was clear to the officers, that fact is not enough to establish that the officers acted with something akin to criminal recklessness.

Salley must present evidence that the officers *actually* knew of and disregarded a substantial risk of harm. *See Mitchell*, 895 F.3d at 498. "Even objective recklessness – failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known – is insufficient to make out a claim." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original).

Deliberate indifference requires a reckless disregard of a known and substantial risk of danger, not the mere absence of ordinary care. *See Hardin v. Baldwin*, 770 F. App'x 289, 290 (7th Cir. 2019). That said, "[i]f a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *See Petties*, 836 F.3d at 729.

Reviewing the record, Salley's use of a cane plus the failure to place him in a first-floor cell did not present a sufficiently obvious risk of harm to Salley.

Start with the stairs. The Seventh Circuit considers both an inmate's ability to walk and the quality of the stairs he must walk on. *Compare Anderson v. Morrison*, 835 F.3d 681, 683 (7th Cir. 2016) ("Forcing someone to walk handcuffed and unaided down stairs needlessly strewn with easily removable milk, food, and garbage, as Anderson alleges, poses an unreasonable peril."), *with Pyles*, 771 F.3d at 410 (holding that a wet stairway is not a hazardous condition of confinement); *see also Perkins v. Pfister*, 711 F. App'x 335, 337 (7th Cir. 2017) (holding that a prison's policy of handcuffing inmates before moving them through "dry, uncluttered stairwells" did not violate the Eighth Amendment).[5]

---

[5] These cases concern unconstitutional conditions of confinement. But inadequate medical care claims and unconstitutional conditions of confinement claims both involve the same deliberate indifference

Salley submits no evidence that the stairs at Stateville NRC were particularly hazardous, slippery, lacked railings, or functioned as obstacle courses. *See Vinegar v. Braggs*, 2019 WL 277747, at *5 (N.D. Ill. 2019) (granting summary judgment on defendant's inadequate medical need claim be he "has presented this Court with no evidence to show that the stairs [he] walked on were covered with debris or posed any sort of safety risk"). And the stairs were not excessively long, either. Salley needed to walk 15 steps to get down to the first level. *See* Salley Dep., at 16:9-13 (Dckt. No. 122-1, at 5 of 18). Without any evidence on the conditions of the stairs, he is left only with the fact that he had a crutch and resided on the second floor.

But using a crutch while walking up or down 15 steps to a cell did not give Defendants actual knowledge of a substantial risk of harm. A crutch is not the same as a wheelchair, or even two crutches. With one crutch, a person's other hand is free to balance himself. He can, for instance, hold onto a railing for extra support. He isn't left helpless on the stairs or subjected to an uncompromising danger.

While Salley relied on a crutch, he submits no evidence that his crutch prevented his ability to go up or down steps. Vertical movement on stairs may be more difficult with a crutch, but it isn't an excessively risky maneuver. Many people rely on a cane or crutch to walk, and those same people can use stairs without putting their health and safety on the line. *See HCP of Illinois, Inc. v. Farbman Grp. I, Inc.*, 978 F. Supp. 2d 943, 946 n.1 (N.D. Ill. 2013) ("[J]udges in summary judgment proceedings . . . are not to ignore common sense and human experience.").

---

standard, so the same considerations apply to both. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Indeed, the two claims are closely related, as "medical care is simply one of the many conditions of confinement to which an imprisoned person is subjected." *See Hardeman v. Curran*, 933 F.3d 816, 822 (7th Cir. 2019) (citing *Wilson v. Seiter*, 501 U.S. 294, 303 (1991)).

In fact, Salley's deposition makes it clear that he *can* take steps without causing injury or facing a risk of harm. When asked if he ever takes stairs outside of prison, Salley responded: "I really don't recall taking stairs that much, to be honest with you. If I do, I take my time." *See* Salley Dep., at 75:3-5 (Dckt. No. 122-1, at 2 of 18). He then added: "So I have taken stairs, but not flights, not no like 30 steps at a time. Probably like two or three steps, five steps here and there. But for the most part I am taking elevators." *Id.* at 75:10-13. Given Salley's self-professed ability to use stairs, albeit at a slower pace, there simply was not an obvious risk to his health in keeping him on the second floor.

So, left only with the low gallery permit and Salley's use of a single crutch, no reasonable jury could conclude that Defendants' refusal to move Salley off the second floor constituted cruel and unusual punishment.

True, the incident in question involved Salley walking down the stairs with both hands full, on his way to the shower. But there is no evidence in the record that could support a finding of deliberate indifference when it came to the fall. Four of the five individual Defendants weren't even there. And Salley couldn't remember if he asked the fifth Defendant (Whitfield) for help.

In any event, the claim is about the assignment to a cell on the second floor, not the fall down the stairs. After considering the record as a whole, and viewing it in a light most favorable to Salley, there is no evidence that could support a finding by a reasonable jury against the five IDOC Defendants. There is no evidence that they showed a reckless disregard of a known and substantial risk of danger when Salley was assigned to a cell on the second floor.

Third, even if Salley could show that the officers acted with deliberate indifference in refusing to assign him to a first-floor cell, qualified immunity would apply.

"Qualified immunity shields a government official from suit when the official is performing a discretionary function and his conduct does not violate clearly established rights of which a reasonable person would have known." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 572 (7th Cir. 2014). To proceed against the officers, Salley "must (1) adequately allege the violation of a constitutional right, and (2) show the right was clearly established at the time of the alleged violation, such that a reasonable public official would have known that his conduct was unlawful." *See Atterberry v. Sherman*, 453 F.3d 823, 826 (7th Cir. 2006).

As already discussed, Salley has not submitted evidence of a violation of his constitutional right against cruel and unusual punishment. But even if he did, Salley still bears the burden of establishing the existence of a clearly established constitutional right. *See Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017). He has failed to satisfy his burden.

Salley relies on the general proposition that deliberate indifference to an inmate's medical need is a clearly established violation of the Eighth Amendment, precluding an application of qualified immunity. *See* Pl.'s Resp., at 14 (Dckt. No. 124) (citing *Bond v. Aguinaldo*, 265 F. Supp. 2d 926, 929 (N.D. Ill. 2003)); *see also Barrows v. Larry*, 2020 WL 1182658, at *10 (N.D. Ill. 2020) ("It is well-established that 'government officials violate inmates' constitutional rights when they deliberately disregard an inmate's serious medical condition, and only a trial can resolve the facts that are in dispute.'") (quoting *Hayes v. Snyder*, 546 F.3d 516, 528 (7th Cir. 2008)).

But Salley defines the principle at a level of generality that is simply too high. A general legal standard is insufficient. Salley must show that the right was "established not as a broad general proposition but in a particularized sense so that the contours of the right are clear to a reasonable official." *See Campbell v. Kallas*, 936 F.3d 536, 548 (7th Cir. 2019) (citation

22

omitted); *see also White v. Pauly*, 137 S. Ct. 548 (2017) (explaining that a plaintiff cannot defeat qualified immunity by defining clearly established law "at a high level of generality").

In the context of Eighth Amendment claims, a plaintiff cannot overcome qualified immunity by simply referring to deliberate indifference to a serious medical need. *See Baisi v. Burke*, 359 F. Supp. 3d 592, 597 (N.D. Ill. 2019); *see also Shaw v. Williams*, 2018 WL 3740665, at *13 (N.D. Ill. 2018) ("That general legal proposition holds true in the abstract, but it lacks any connection to the facts of this case and thus does not help Plaintiff.").

Salley offers no authority to suggest that placing an inmate with a crutch and low gallery permit on the second floor violates clearly established law. None of his cited authorities are sufficiently particularized to the facts here. He cites no case involving an inmate with an assistive device and a cell above the first floor. And the Court could not find any, either. Accordingly, the Defendant officers are entitled to qualified immunity.

The Court grants summary judgment on Salley's Eighth Amendment claims against the five IDOC officers for failing to assign him to a first-floor cell.

## IV.    Unconstitutional Conditions of Confinement (Count III)

Finally, Salley brings an unconstitutional conditions of confinement claim against the same five IDOC correctional officers (Whitfield, Parker, Leiby, Clark, and Farley). He argues that his second-floor cell had rat feces on the floor, bloodied sheets, and blankets that smelled of urine. He also alleges that the cell light would not turn off, and that Defendants denied his requests for cleaning supplies. *See* Pl.'s Statement of Facts, at ¶ 6 (Dckt. No. 126); Pl.'s Resp., at 11–12 (Dckt. No. 124). Salley arrived at Stateville NRC on June 6, and he was reassigned to a first-floor cell on June 12. So he spent six days in the second-floor cell.

23

A prisoner's claim about his conditions of confinement falls under the Eighth Amendment's Cruel and Unusual Punishment Clause. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To establish a constitutional violation about his living conditions, Salley must demonstrate that: (1) the conditions were objectively so adverse that they deprived him "of the minimal civilized measure of life's necessities;" and (2) Defendants acted with deliberate indifference to the conditions. *See Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (quoting *Farmer*, 511 U.S. at 834).

Life's necessities include shelter, heat, clothing, and adequate sanitation. *See Budd v. Motley*, 711 F.3d 840, 842–43 (7th Cir. 2013); *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). A deprivation must be sufficiently serious, meaning the condition must create "a serious risk to an inmate's health or safety or be sufficiently prolonged so as to cause significant pain or discomfort." *See Hall v. Nicholson*, 2022 WL 407649, at *3 (N.D. Ill. 2022); *see also Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021). And individual deprivations can work together, creating a "mutually enforcing effect which produces the deprivation of a single, identifiable human need, such as food or warmth." *See Murithi v. Hardy*, 2016 WL 890695, at *9 (N.D. Ill. 2016) (quoting *Gillis*, 468 F.3d at 493); *see also Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) ("[S]ome conditions of confinement may establish an Eighth Amendment violation in combination when each alone would not do so.") (cleaned up).

Salley's conditions of confinement claim fails on the first element – he has not shown that his cell's conditions were so adverse that they denied him of life's necessities. Salley does not describe the light in his cell, the extent of rat feces on the floor, or the degree of blood and urine stains on his bedding. Regardless, taking the evidence in the light most favorable to him, those alleged conditions do not rise to the level of a constitutional violation.

24

In short, Salley's cell conditions were not sufficiently serious to qualify as a constitutional violation on their own, and he did not spend enough time in the cell to transform them into a violation. The conditions do not have a mutually enforcing effect, either. *See Allen v. Engelson,* 2016 WL 4245514, at *4–5 (N.D. Ill. Aug. 11, 2016) (finding a six-day exposure was not sufficiently serious when it involved droppings from mice and birds); *see also Walker v. Dart*, 2010 WL 669448, at *4 (N.D. Ill. 2010) ("Being denied clean clothes for two weeks, though unpleasant, is not a deprivation serious enough to support an Eighth Amendment claim."); *Moss v. DeTella*, 1997 WL 24745, at *2 (N.D. Ill. 1997) (holding that lack of clean clothes and bedding for 111 days did "not rise to the level of a constitutional violation"); *Martin v. Lane*, 766 F. Supp. 641, 648 (N.D. Ill. 1991) (holding that deprivation of laundry services for between three and eighteen days is not sufficiently serious injury).

The conditions that Salley experienced are undoubtedly uncomfortable. But "[p]rison conditions 'may be uncomfortable, even harsh, without being inhumane.'" *See Buchanan v. Pfister*, 2020 WL 902829, at *8 (N.D. Ill. 2020) (quoting *Est. of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017)); *see also Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008).

Indeed, "extreme deprivations are required to make out a conditions-of-confinement claim." *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001). Conditions that survive summary judgment involve far harsher surroundings than what Salley has put forward. *See, e.g.*, *Thomas v. Blackard*, 2 F.4th 716, 720–21 (7th Cir. 2021) ("Thomas's assertions of feces-covered walls, a lack of hot water, hundreds of dead flies in his bed, and a mattress covered in human waste no doubt establish a material dispute on the objective prong of an Eighth Amendment claim."); *Gray*, 826 F.3d at 1003 (reversing summary judgment where prisoner spent 15 years in a cell infested with "vermin, insects, and birds," without cleaning supplies); *Vinning–El v. Long*,

482 F.3d 923, 923–24 (7th Cir. 2007) (reversing summary judgment where "floor of the cell was covered with water, the sink and toilet did not work, and the walls were smeared with blood and feces," and the prisoner "was forced to remain in the cell without a mattress, sheets, toilet paper, towels, shoes, soap, toothpaste, or any personal property"); *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (reversing summary judgment where prisoner "was forced to live with 'filth, leaking and inadequate plumbing, roaches, rodents, the constant smell of human waste, poor lighting, inadequate heating, unfit water to drink, dirty and unclean bedding, without toilet paper, rusted out toilets, broken windows, and drinking water containing small black worms which would eventually turn into small black flies,'" which appeared "strikingly reminiscent of the Black Hole of Calcutta") (cleaned up); *Hall*, 2022 WL 407649 at *4 ("[Plaintiff's] undisputed account of rampant pest activity throughout the prison, coupled with his exposure to toxins and moldy and filthy showers, walls, dining tables, and trays – which all resulted in him developing persistent respiratory and skin conditions – is sufficient to create a disputed issue of fact as to whether his living conditions were constitutionally deficient.").

And while Salley also alleges the lack of cleaning supplies, the Seventh Circuit has recognized Eighth Amendment violations for deprivations of cleaning supplies "only in extreme circumstances." *See Gray*, 826 F.3d at 1005 (collecting cases). Salley has not presented evidence of extreme circumstances, so the lack of cleaning supplies does not move the needle.

Finally, Salley does not present any evidence that he suffered from some type of cognizable harm on account of the conditions. *See Gray*, 826 F.3d at 1006 ("Gray must do more than demonstrate a triable issue of fact with respect to the conditions he faces; he must also show that he suffered some cognizable harm from the overall lack of a sanitary environment . . . ."); *see also Towns v. Dart*, 2017 WL 4572209, at *3 (N.D. Ill. 2017) ("The plaintiff must show that

26

he suffered some type of cognizable harm from the conditions.") (citing *Gray*, 826 F.3d at 1005); *Allen*, 2016 WL 4245514, at \*4.

A plaintiff can rely on physical, psychological, or future injury as a cognizable harm. *See Craddock v. Pfister*, 2022 WL 1499808, at \*3 (N.D. Ill. 2022). But here, Salley offered no such evidence. His complaint alleges that he suffered headaches and extreme emotional distress because of his cell's conditions. *See* Am. Cplt., at ¶ 65 (Dckt. No. 100). But Salley offered no evidence of any such harm. At the summary judgment stage, facts and evidence matter, but allegations do not. And this Court will not dig through the record to find evidence for Salley's own position. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003).

So Salley does not mention any harm arising out of his cell conditions, and he submits no evidence that supports the existence of any such harm. Without any cognizable harm, Salley's claim cannot survive summary judgment. *See, e.g.*, *Wilson v. Schomig*, 863 F. Supp. 789, 795 (N.D. Ill. 1994) ("Although a closer call, plaintiff's claim with regard to the urine and feces stained mattress also falls short of the objective standard of seriousness. Indeed, while not a pleasant condition of confinement, there is no allegation that Wilson suffered any physical harm from the stains on his mattress."); *Harris v. Fleming*, 839 F.2d 1232, 1234 (7th Cir. 1988) (holding that a "filthy, roach-infested cell" without toilet paper for five days, and no soap, toothbrush, or toothpaste for ten days, was not a constitutional violation because the "conditions were temporary" and "[a]lthough Harris experienced considerable unpleasantness, he suffered no physical harm").

The Court grants summary judgment to the five individual Defendants on Salley's claim of unconstitutional conditions of confinement.

### Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted.

Date:   July 26, 2022

                                      Steven C. Seeger
                                      United States District Judge